**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| Melvin Ford, | |
| Plaintiff, | |
| v. | Case No. 3:19-cv-50056 |
| County of Winnebago, Illinois, Sheriff Gary Caruana, Robert Redmond, John Liston, Eligio Rijas, Chad Bounds, James Kennay, Anthony Ponte, Timi Moore, Tim Owens, and Rob Lukowski, and Dr. Kenton Lee, | Honorable Iain D. Johnston |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Melvin Ford brings this action against the County of Winnebago, Illinois; its Sheriff, Gary Caruana; Winnebago County Jail Superintendent Robert Redmond; Captain Timothy Owens; Lieutenant Rob Lukowski; Sergeants Timi Moore, Anthony Ponte, James Kennay, and Chad Bounds; and Correctional Officers Eligio Rijas and Jason Liston ("County Defendants"). Ford also names Dr. Kenton Lee, who was responsible for medical care at the Winnebago County Jail. During the relevant time, Ford was a pretrial detainee at the Winnebago County Jail.

In Count I, he brings a *Monell* claim challenging the Jail's policy of constantly illuminating each cell with a 9-watt night light. In Count II, he asserts that the same condition of confinement—constant illumination—violated his Fourteenth Amendment Due Process rights "because [the Defendants] were aware of Plaintiff's serious medical condition and needs and were deliberately indifferent

1

to them, resulting in harm to Plaintiff." Dkt. 85, ¶ 36. Lastly, in Count III, Ford claims that all Defendants are liable for intentional infliction of emotional distress. Dr. Lee and the County Defendants now separately move the Court for summary judgment on all claims. For the reasons explained below, both motions [157,158] are granted.

## I.    Background

Melvin Ford was incarcerated at the Winnebago County Jail ("the Jail") between March 5, 2017, and June 19, 2018.[1] While at the Jail, Ford was a pretrial detainee. He was transferred to the Illinois Department of Corrections on June 19, 2018, to begin serving a sentence for endangering the life of his minor child. Corrections staff at the Jail make visual checks on the inmates at least every thirty minutes during the night to ensure the security and safety of the Jail. This includes the need to prevent escape, to ensure no one is hiding or making weapons or other contraband, attempting suicide, engaging in sexual assault, or otherwise having a medical emergency. Because the main lights are dimmed at night, the Jail installed 9-watt night lights in each cell to provide enough illumination to allow the correctional officers to see into each cell to check on the inmates and detainees. Without that constant illumination, the officers would have to shine flashlights into the cells or otherwise turn the night lights on and off throughout the night.

The night lights are about 6.5 inches long and are installed just over seven feet off the ground, inside a light fixture, on the back wall of the cell and above the

---

[1] The facts recited here are taken from the parties' Local Rule 56.1 statements of undisputed fact.

2

toilet and sink. The light fixture itself also contains three 40-watt bulbs, but everything except the night light is turned off between 10:30 PM and 6:00 AM. A picture of the night light, removed from its housing, is below.



Ford complained to corrections staff that the constant illumination from the night lights was causing him to have headaches. They responded that he should speak with medical staff.

Dr. Kenton Lee, a board-certified physician, serves as the Director of the Jail's medical clinic. He examined Ford six times during his detention at the Jail.

3

As the medical director of the Jail's clinic, Dr. Lee is responsible for providing medical treatment to the Jail's inmates and detainees. Though Ford believes Lee *could* have said something to Jail staff about the constant illumination, Dr. Lee has no authority to change Jail policy regarding the night light.

Ford began wearing glasses at an early age and continued to wear them until he received corrective eye surgery from Dr. Edward Yavitz, before his time at the Winnebago County Jail. In May 2017, years after the eye surgery and while a detainee at the Jail, Ford requested an appointment with Dr. Yavitz for a "touchup," but Dr. Lee did not think the touchup was medically urgent.

On August 21, 2017, Dr. Lee examined Ford. Ford complained of chest pains, headaches, and a "pop" in his head. He also reported tingling and numbness in his extremities. Though Dr. Lee could not explain the "pop" that Ford reported hearing, he believed the headaches were related to Ford recently hitting his head on his bunkbed. Ford also presented with significantly high blood pressure. Because Ford believed—for some reason—the "pop" might be an aneurism, he asked for a brain scan. Dr. Lee didn't see that as necessary or helpful under the circumstances, and Ford admits that he agreed. Instead, Dr. Lee prescribed 650 milligrams of Tylenol, three times per day, with a follow-up examination in a month. Ford did not take the Tylenol. Ford asserts that Dr. Lee did not tell him to take the Tylenol. Dr. Lee does not specifically remember if he told Ford to take the Tylenol, nor does he know when the medication was given to Ford. On September 6, 2017, Ford was offered

Tylenol, but he refused to take it because he was not sure if the medication was given on Dr. Lee's orders—given that Ford did not remember it being prescribed.

On September 7, 2017, Dr. Lee examined Ford for the second time. A neurological examination showed normal results, meaning that brain imaging was not necessary. But because Ford again complained of chest pains, Dr. Lee ordered an EKG.[2] Ford's blood pressure was also still high, though lower than the first visit. Ford also complained about continued headaches, which Dr. Lee noted were probably vascular migraine-type headaches aggravated by sensitivity to light. So, Dr. Lee prescribed 40 milligrams of Propranolol to be taken twice per day, which he believed would bring the blood pressure down and help alleviate the underlying cause of the headaches. He then directed Ford to follow up in two weeks. Though not a doctor, Ford again requested a brain scan. But Dr. Lee believed the headaches were caused by the high blood pressure and that a brain scan was not necessary.

On September 18, 2017, Dr. Lee examined Ford for a third time. This time, Ford's blood pressure was worse than the previous visit. It was 170 over 110, and then when it was re-checked to confirm, it was 172 over 114. Ford voiced concerns over the side effects of Propranolol, which Dr. Lee had prescribed, and which Ford had refused to take so far. Dr. Lee again encouraged Ford to take his prescribed medication. So, just to be clear, by this time, Dr. Lee thought Ford's headaches were

---

[2] An EKG, or electrocardiogram, is a "[g]raphical record of the heart's integrated action currents obtained with the electrocardiograph displayed as voltage change over time. *Electrocardiogram*, Stedman's Medical Dictionary (28 ed. 2006). An EKG is used to "quickly detect heart problems and monitor your heart's health." *Electrocardiogram (ECG or EKG)*, MayoClinic.org (April 9, 2020), https://www.mayoclinic.org/tests-procedures/ekg/about/pac-20384983.

caused by Ford's high blood pressure and prescribed Ford medication for the high blood pressure. Ford, however, refused to that the medication.

At this point, Dr. Lee believed the chest pain was lung related, rather than chest related, because the pain subsided when Ford held his breath. Dr. Lee also diagnosed Ford with double vision in one eye, which Dr. Lee believed to be a side effect of Ford's corrective eye surgery. Because it was not an emergency, Dr. Lee explained that he was not sending Ford to see Dr. Yavitz at that time. No matter: Ford apparently did not want to see Dr. Yavitz then anyway. He wanted a brain scan for his headaches. Ford believed that Dr. Lee was being unethical because he declined to order the brain scan. Ford believed it was to save the County money, but Dr. Lee noted that a neurological examination was normal and not consistent with an aneurism. (To cut to the chase, unsurprisingly, there's no evidence that Ford ever suffered an aneurism.)

Notwithstanding his belief that a brain scan was not necessary, Dr. Lee ordered a CT scan of the brain and another EKG to build trust with Ford and to encourage him to take his medication. According to progress notes on September 24 and October 2, 4, 13, 18, and 19, however, Ford continued to refuse his blood pressure medication—the medication Dr. Lee prescribed to decrease Ford's high blood pressure, which Dr. Lee believed caused Ford's headaches.

On October 23, 2017, Dr. Lee again examined Ford. Dr. Lee gave Ford the results of the brain scan and EKG. The brain scan was normal, but the EKG showed mild thickening due to increased blood pressure. Ford complained that his

eyesight had worsened, which he believed was due to the constant illumination of his cell. Dr. Lee, however, believed that the light would not worsen Ford's condition. He further explained the risk of heart attack and stroke to Ford and that patients with blood pressure as high as his are treated with medication. He further explained that he believed the light sensitivity was caused by headaches and not the eye surgery, which had occurred years earlier. He again encouraged Ford to take his Tylenol and blood pressure medication. Nevertheless, a medical progress note dated November 11, 2017, documented that Ford continued to refuse his medication. Another medical progress note from two days later explained that Dr. Lee ordered continued monitoring of Ford's blood pressure. He discontinued the Tylenol because of Ford's refusal to take the medications, but he continued the Propranolol prescription because Ford's blood pressure remained high.

Dr. Lee again examined Ford on November 27, 2017. At this visit, Ford's blood pressure remained too high, but it had lowered somewhat to 156 over 110. Ford reported double and triple vision in his right eye. Despite the high blood pressure and Dr. Lee's attempts to treat it with a prescription, Ford again declined to take the prescribed blood pressure medication. Instead, though still not a physician, Ford indicated that he wanted a natural approach. Dr. Lee performed an examination of Ford's eyes, based on the report of double and triple vision, but he saw no signs of photophobia, which according to Dr. Lee indicated that the light sensitivity was not severe. Based on the examination, Dr. Lee did not believe Ford had an eye condition that was causing him pain or that required urgent care. He did

note, however, double vision in Ford's right eye attributed to a corneal issue. Dr. Lee referred Ford to Dr. Yavitz, the specialist who performed the original corrective eye surgery, to look at the double vision. The next day, Dr. Lee called Dr. Yavitz's office regarding an appointment for Ford. Dr. Lee was informed that Ford had previously complained about double vision and had set four previous appointments but had failed to show up. So, not only did Ford refuse to take prescribed medication, but he also failed to appear for eye appointments.

On December 7, 2017, Dr. Lee asked staff to check with Dr. Yavitz to see if Dr. Yavitz considered Ford's double vision to be a condition that needed to be addressed soon, or if it could wait. On December 19, 2017, staff indicated on a progress note that Dr. Yavitz informed them that Ford would have some blurred vision and may require glasses if a touch-up corrective eye surgery was not approved, given that the eye surgery is an elective procedure.

On December 21, 2017, Dr. Lee examined Ford for the last time. Though Dr. Lee diagnosed hypertension during this visit, Ford still refused his blood pressure medication. Again, he wanted a natural remedy. Specifically, he wanted to be given teas, which were apparently recommended in Moorish books by Prophet J. Ali. At that visit, Dr. Lee further noted a suspect corneal issue related to LASIK, which he planned to call Dr. Yavitz about. Ford indicated that his eyesight was deteriorating quickly and that he could see a black dot in his eye. Without any evidentiary support, Ford believed the fluorescent lights were damaging his eyes. Dr. Lee believed Ford had a non-eye-related headache caused by migraines.

On February 22, 2018, Ford was examined by Dr. Yavitz, who prescribed glasses and a scleral contact lens for Ford's right eye. The same day, Dr. Lee noted that he needed clarification regarding whether the prescription was designed to treat the symptoms Ford mentioned to Dr. Lee, or whether it was related to a separate issue, as well as the urgency for further treatment. Dr. Lee did not see a response from Dr. Yavitz until Ford had already been transferred to the custody of the Illinois Department of Corrections on June 19, 2018.

## II.   Analysis

On summary judgment, the movant has the burden of showing that "no genuine dispute as to any material fact" exists and that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that might affect the outcome of the suit. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). No "genuine" dispute exists if a court would be required to grant a Rule 50 motion at trial. *Id.* at 250–51. The Court must construe the "evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). "Summary judgment is only warranted if, after doing so, [the Court] determine[s] that no jury could reasonably find in the nonmoving party's favor." *Blasius v. Angel Auto, Inc.*, 839 F.3d 639, 644 (7th Cir. 2016).

### A. Injunctive Relief

As an initial matter, Ford's complaint prays for monetary and injunctive relief. Dkt. 1, ¶ 1. But Ford is no longer incarcerated at the Jail. Though not pointed

9

out by the parties, the Court notes that Ford cannot seek injunctive relief when he is no longer incarcerated at the Jail. This is a well-settled requirement of Article III of the U.S. Constitution.

Article III of the U.S. Constitution limits federal court's jurisdiction to live cases and controversies. U.S. Const. art. III. Injunctive relief asks the Court to proscribe Defendants' future conduct. But plaintiffs do not have a legally cognizable interest in the future conduct of jail defendants when that plaintiff no longer resides at the jail. Thus, when an inmate leaves the jail, his or her claim for injunctive relief can no longer be considered live for the purpose of Article III of the U.S. Constitution. *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996) ("If a prisoner is transferred to another prison, his request for injunctive relief against officials of the first prison is moot unless 'he can demonstrate that he is likely to be retransferred.'"). The only exception is where the plaintiff's return to a defendant's jail is "virtually certain." *Bernard v. Scott*, 501 F. Supp. 3d 611, 629–30 (N.D. Ill. 2020); *Pennie v. County of Winnebago*, No. 96 C 50389, 1997 U.S. Dist. LEXIS 18084, at *9 (N.D. Ill. Nov. 10, 1997).

Nothing in the record indicates that Ford is virtually certain to return to the Jail, so his claims for injunctive relief are moot. At bottom, Ford lacks any interest in a policy change regarding the constant illumination of Winnebago County Jail cells because he no longer resides at the Jail, and thus would not be affected by such a policy change.

### B. Intentional Infliction of Emotional Distress

In Count III, Ford brings a claim of intentional infliction of emotional distress against all Defendants. To establish a claim for intentional infliction of emotional distress in Illinois, a plaintiff must show (1) that the defendant's conduct was extreme and outrageous, (2) that the defendant intended to inflict severe emotional harm or knew that the harm was highly likely to result, and (3) that the harm did in fact result. *Motley v. United Airlines, Inc.*, 2017 U.S. Dist. LEXIS 32619, at *10 (N.D. Ill. Mar. 8, 2017) (citing *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 79–80 (Ill. 2003)). The level of severity necessary to establish a claim for intentional infliction of emotion distress is extreme, such that no reasonable person should be expected to endure it. "Fright, horror, grief, shame, humiliation, worry, and other such mental conditions alone are not actionable." *Taliani v. Resurrection*, 2018 IL App. (3d) 160327, ¶ 26. "[T]o qualify as outrageous, the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Feltmeier*, 798 N.E.2d at 83.

Ford claims that being subjected to constant illumination during his 468-day stay in the jail "without rational purpose or need" amounted to an intentional infliction of emotional distress. Dkt. 85, ¶ 32. All Defendants move for summary judgment on this claim. Although Ford failed to respond to the Defendants' motion for summary judgment on his IIED claim, the Defendants still must meet their burden to show they are entitled to judgment as a matter of law. *Robinson v.*

11

*Waterman*, 1 F.4th 480, 483 (7th Cir. 2021). Here, the Defendants have met that burden.

First, the Court already explained in a previous order dismissing this claim in an earlier version of Ford's complaint that his allegations do not amount to intentional infliction of emotional distress because the use of night lights is not extreme or outrageous behavior, and because he did not allege that the Defendants subjectively intended to cause suffering. Dkt. 27, at 2. Second, after the aid of discovery, the claim still fails on the merits. The record is void of any evidence that any defendant intended to cause emotional distress of any kind when they installed night lights in each cell, or that they knew that a high probability existed that such harm would result. *Doe v. Calumet City*, 641 N.E.2d 498, 506 (Ill. 1994) (requiring that the defendant intended to inflict severe emotional distress or knew that such a result was highly probable).

Dr. Lee undisputedly had nothing to do with the decision to put night lights in the cells, or the decision to keep the night lights in place (they've been there since 2007). To be sure, the Jail has asked his opinion on certain medical-related policies in the past (e.g., Covid policies). But that is a fry cry from having any authority or control over the Jail's lighting and security policies. Thus, Dr. Lee had no involvement in the circumstances surrounding Ford's IIED claim. Furthermore, the reason the Jail installed the night lights in each cell was to promote the safety and security of the inmates and the facility and to allow correctional staff the ability to

do their routine cell checks during the night. Even if they are incorrect to believe that this is the best solution, it doesn't amount to *intentionally* wrongful conduct.

Lastly, the use of 9-watt night lights in each cell is not so outrageous as to go beyond all possible bounds of decency. In determining whether conduct is sufficiently severe, intensity and duration are factors courts consider. *Taliani*, 2018 IL App. (3d) 160327, ¶ 27. Here, the duration is constant, which weighs in Ford's favor, but the intensity is not significant. The Jail did not subject Ford to constant day-time illumination. It merely put a night light in each cell to allow correctional officers to perform quick inspections of each cell every thirty minutes without having to shine flashlights in the cell or constantly switch lights on and off. At bottom, this conduct simply does not cause a reasonable person to exclaim "Outrageous!" *Diggs v. Ghosh*, 850 F.3d 905, 912 (7th Cir. 2017); *see also Dixon v. County of Cook*, 819 F.3d 343, 351 (7th Cir. 2016) ("The requirement of finding 'extreme and outrageous' conduct is a demanding one, and it will not be met in every instance where a plaintiff has stated a claim under the Eighth Amendment (which itself sets a high bar)."). Thus, all Defendants are entitled to judgment as a matter of law on Ford's IIED claim.

## C. Due Process Claim

In Count II, Ford challenges the conditions of his confinement under the Eighth and Fourteenth Amendment. He challenges his exposure to constant illumination for his 468-day detention at the Jail, based on the Jail's decision to use 9-watt night lights in each cell. Because Ford was a pretrial detainee, however, the

Eighth Amendment is inapplicable. Rather, a pretrial detainee's challenge to the constitutionality of his or her conditions of confinement is subject only to the objective reasonableness test announced by the Seventh Circuit in *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). *See also Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019) ("We therefore hold that *Kingsley*'s objective inquiry applies to all Fourteenth Amendment conditions-of-confinement claims brough by pretrial detainees.").

In determining whether the defendants' actions were objectively reasonable, courts apply a three-prong test: (1) the condition of confinement, or the medical need, must have been objectively serious; (2) the defendant must have acted purposely, knowingly, or at least with reckless disregard to the consequences of his or her actions; and (3) the defendant's actions must have been objectively unreasonable. *Hardeman v. Curran*, 933 F.3d 816, 827 (7th Cir. 2019) (Sykes, J., concurring). Under the third element, actions are objectively unreasonable when they are "not rationally related to a legitimate governmental objective or . . . excessive in relation to that purpose." *Id.* (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015)).

Objective reasonableness is not a mechanical standard but a case-by-case analysis of the totality of the circumstances. *Mays v. Dart*, 974 F.3d 810, 819 (7th Cir. 2020). Furthermore, the Constitution is not blind to the legitimate needs of jail and prison staff to manage their facilities. *Kingsley*, 576 U.S. at 398. Rather, in evaluating objective reasonableness, courts should afford reasonable deference to

jail policymakers. *Mays*, 974 F.3 at 820. "[T]he problems that arise in the day-to-day operations of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

Ford's complaint challenges both his medical care at the Jail and the constitutionality of using 9-watt night lights in each cell, such that he was exposed to constant illumination.

### 1. Medical Care

Ford first challenges the medical care he received during his detention at the Jail. Though he names all defendants, the County Defendants are not medical staff, and can therefore reasonably rely on the expertise of medical staff to make the appropriate medical decisions. *Eagan v. Dempsey*, 987 F.3d 667, 694 (7th Cir. 2021). Indeed, the law encourages non-medical defendants to rely on the professional judgment of medical staff by applying a presumption in their favor. *Id.* ("Non-medical officials are presumptively 'entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care."). This presumption can be overcome, however, by a showing that the non-medical officials knew that medical staff was failing to provide constitutionally adequate care and did nothing about it. *Id.* (quoting *Miranda*, 900 F.3d at 343).

Here, however, no evidence in the record exists to overcome the presumption that the County Defendants reasonably deferred to the medical judgment of Dr. Lee. On the contrary, Ford's response fails to argue the point. Instead, his response to the County Defendants implies that he only intended to sue them generally for using the 9-watt light bulb and not for the medical treatment he received at the Jail. Dkt. 166, at 13–14 (distinguishing *Bernard v. Scott* because that case involved medical care as opposed to the plaintiff's general conditions of confinement). Regardless, the record establishes that Dr. Lee saw Ford six times during his detention at the Jail, was given a CT scan even though Dr. Lee didn't think it was necessary, and was further seen by Dr. Yavitz, an ophthalmology specialist. Under these circumstances, the County Defendants reasonably relied on the expertise of medical professionals and cannot be liable even if Dr. Lee's care was constitutionally inadequate. Thus, even if Ford intended to sue the County Defendants for providing constitutionally inadequate medical care, they are entitled to judgment as a matter of law on the claim.

The evidence in the record further establishes that Ford cannot prevail against Dr. Lee. Even if Ford's medical need was objectively serious, he cannot establish that Dr. Ford acted with reckless disregard to the consequences of his actions—the second element of the objective reasonableness test explained above. Indeed, the evidence establishes that Dr. Lee examined Ford on six separate occasions, that he believed the light sensitivity was caused by Ford's migraines, which were in turn caused by his high blood pressure. So, Dr. Lee prescribed blood

pressure medication. As further evidence that Dr. Lee did not recklessly disregard Ford's needs, he sought to overcome Ford's refusal to take his medication by giving Ford what he wanted, a CT scan. Dr. Lee believed the scan was unnecessary but authorized it anyway in an effort to establish trust with Ford and encourage him to take the blood pressure medication. The scan was normal, but Ford continued to decline the prescribed treatment.

In *Pittman v. County of Madison*, the Seventh Circuit explained that defendants act recklessly—under the objective reasonableness test—when they are not aware that their actions would be harmful but nonetheless "strongly suspected" that the consequences of their actions would be harmful to the plaintiff. 970 F.3d 823, 828 (7th Cir. 2020). Here, the record is void of any evidence that Dr. Lee strongly suspected his actions would lead to harmful consequences. Indeed, the only conclusion a reasonable jury could make from the evidence is that Dr. Lee strongly suspected that Ford's decision to decline treatment could lead to harmful consequences. That is why Dr. Lee attempted to gain Ford's trust by authorizing a medical procedure that Dr. Lee did not believe was medically necessary (or even warranted), but that Ford wanted.

In his response to Dr. Lee's motion for summary judgment. Ford fails to explain his failure to accept the offered medical treatment, though the record indicates that he wanted a different treatment (teas described in a Moorish book).[3]

---

[3] To be clear, the Constitution does not require Dr. Lee to use the exact treatment that Ford wanted, nor does it prescribe *one* "proper" treatment. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) ("There is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field.").

Instead, Ford pivots. He focuses on the evidence that he was seen again by Dr. Yavitz, and that Dr. Lee wanted to understand that specialist's opinion in more detail so that he would know how best to proceed. Dr. Lee, however, did not hear back from Dr. Yavitz until after Ford left the Jail a few months later. Ford believes this establishes a genuine dispute of material fact regarding whether Dr. Lee was constitutionally reckless in his treatment of Ford. Dkt. 169, at 8. It does not.

Courts have repeatedly explained that plaintiffs must show that a medical defendant's care was more than merely negligent. Even medical malpractice is not enough to establish a constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018) ("A showing of negligence or even gross negligence will not suffice."); *Miranda*, 900 F.3d at 353 (rejecting the argument that the objective reasonableness test would allow claims of mere negligence to suffice for liability). Thus, even if Dr. Lee were negligent in his failure to follow up with Dr. Yavitz—and to be clear, there's no evidence that Dr. Lee was negligent—his care was not constitutionally inadequate. On the contrary, the record establishes that Dr. Lee tried, several times, to treat what he believed was the underlying cause of Ford's condition, his blood pressure. And Ford declined that treatment. At bottom, a detainee cannot refuse medically accepted treatment only to turn around and contend that the doctor unconstitutionally failed to treat his serious medical condition. Dr. Lee is entitled the summary judgment. Dr. Lee should not be condemned for his care of

Ford but, instead, should be commended. Ford's claim is frivolous, both in the everyday sense and the legal sense.[4]

### 2.  Use of the 9-Watt Night Light

As noted above, Ford's complaint challenges both his medical treatment and the Jail's use of night lights in each cell. As he sees it, this exposure to constant illumination violates his rights under the Fourteenth Amendment.

The County Defendants make several arguments in support of their motion for summary judgment. For example, they contend that most defendants cannot be sued in their individual capacity because they were not personally involved in the purported constitutional harm. They further contend that most defendants should be removed from Ford's official capacity claim because they are redundant. The Court need not consider these arguments, however, because Ford cannot establish the existence of any constitutional violation. Thus, the various County Defendants are entitled to judgment as a matter of law.

As explained above, courts apply a three-prong test in conditions of confinement cases brought by pretrial detainees. *Hardeman*, 933 F.3d at 827 (Sykes, J., concurring). Under the third element of that test, the plaintiff must establish that the defendant's conduct was objectively unreasonable, which means that it was not rationally related to a legitimate governmental purpose—or was otherwise excessive compared to the needs of that purpose. *Id.* (quoting *Kingsley v.*

---

[4] The Court thanks and appreciates assigned counsel's pro bono work on this case. But just like in retained cases, some claims in litigation should be abandoned when the facts do not support the claim.

*Hendrickson*, 576 U.S. 389, 398 (2015)). This language parallels the Supreme Court's longstanding admonition that courts must defer to prison officials on question of institutional security. "Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

In response, Ford seems to argue that the Jail should use a "less intrusive manner" of effectuating its objective. Dkt. 166, at 5 (distinguishing a cited case by arguing that the less intrusive policy would be to turn on the night lights only during the correctional officers' inspections every thirty minutes). But requiring the Jail to implement the least intrusive policy would fly in the face of the long-standing instruction to accord wide-ranging deference to prison officials in the making of policies regarding institutional safety and security. Ford next points to the Jail's rule that inmates may not cover their eyes with anything if that covering would prevent correctional officers from being able to identify them. *Id.* at 7. He further points out that correctional officers have some discretion regarding how to react when an inmate or detainee attempts to cover their eyes. *Id.* But that makes sense, and it is entirely reasonable. The point is that the facial covering cannot obscure the identity of the inmate or detainee, an obviously important aspect of a safety and security inspection. Ford explains that the inability to use an eye covering is important because inmates and detainees are not permitted to cover the lights. Of course, installing lights would be entirely pointless and ineffective if the

Jail allowed its residents to cover them up. At its core, this case is about whether the Jail is constitutionally permitted to illuminate cells at night with a 9-watt light bulb.

Although some people might reasonably be mildly annoyed by being forced to have a night light in their living quarters, the Constitution does not ban the practice. This is not a case in which the plaintiff was subjected to constant daytime illumination. It is merely a matter of whether the use of a 9-watt night light is rationally related to the prison's legitimate objective of maintaining the safety and security of the facility, its residents, and staff. As the Seventh Circuit has explained, this means that the policy must not be excessive in relation to that purpose. *Hardeman*, 933 F.3d at 827 (Sykes, J., concurring). Though Ford may have preferred a different method of illumination (e.g., using a flashlight, or turning the night lights on and off throughout the night), the Jail's policy is still clearly within the range of reasonableness. Ford's claim trivializes the Constitution.

Citing *Turner v. Safley*, 482 U.S. 78 (1987), Ford contends that turning the night lights on for only the duration of the inspections would serve the same purpose and that the presence of an easy alternative is evidence of an "exaggerated response." Dkt. 166, at 11. That case does not help Ford. In *Turner*, the Supreme Court set out four factors to employ when determining the reasonableness of a prison policy. First, a valid and rational connection must exist between the policy or regulation and the legitimate purpose invoked. *Turner*, 482 U.S. at 89. Second, the existence of other avenues is relevant. The *Turner* court explained, however, that

21

"courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.'" *Id.* at 90 (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)). Third, courts should consider the impact "on guards and other inmates, and on the allocation of prison resources generally." *Id.* Fourth, and similar to the second factor, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.* But in explaining this last factor, the court noted, "This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.* at 90–91.

Based on these factors, the Court has no trouble holding that the Winnebago County Jail's policy of using 9-watt night lights in each cell is not objectively unreasonable. It is without a doubt rationally connected to the valid governmental objective of maintaining the safety and security of the Jail. And though alternate means of achieving this objective may exist, the Jail is not required to use the least restrictive method available. Furthermore, consideration of the impact on correctional officers, jail resources, and other inmates, weighs in the Jail's favor. It is perfectly reasonable to think that other inmates might prefer not to have flashlights shined in their eyes throughout the night, or that requiring a correctional officer to turn the lights on and off when they are needed (versus keeping them on throughout the night) might be unduly burdensome. In the end, however, that decision is for the Jail's policymakers—not the Court—because it is

rationally related a legitimate objective, is not an exaggerated response, and federal courts have been repeatedly instructed to afford prison facilities substantial deference in such matters.

Because the Jail's decision to use 9-watt night lights is rationally related to its legitimate governmental objective of maintaining the safety and security of the Jail, Ford cannot establish the third element of the objective reasonableness test. The various defendants, therefore, are entitled to judgment as a matter of law.

### D. *Monell* Claim

Ford also brings a claim under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1987) against Sheriff Caruana in his capacity as the final policymaker for the Winnebago County Jail.[5] He contends that the policy and practice of installing 9-watt night lights in Jail cells violates his constitutional rights. But liability under *Monell* cannot lie in absence of a constitutional injury. *J.K.J. v. Polk County*, 960 F.3d 367, 377 (7th Cir. 2020) (en banc) ("A primary guardrail is the threshold requirement of a plaintiff showing that a municipal policy or custom caused the constitutional injury."). Thus, because the policy to install night lights in each cell does not amount to a constitutional injury, as explained above, Ford's *Monell* claim must fail.

---

[5] Ford also contends that Superintendent Redmond can be sued on a *Monell* theory because the Sheriff delegates substantial policymaking authority to him. Because that discussion is not necessary to the outcome of this claim, the Court does not consider the argument.

### III.    Conclusion

For the foregoing reasons, both motions for summary judgment [157,158] are granted in full. All Defendants are entitled to judgment as a matter of law. Civil case terminated.

Again, the Court thanks assigned counsel for his work on this case. The Court hopes that Ford understands the excellent—and free—representation he received.

Date:  January 20, 2022

_____
Honorable Iain D. Johnston
United States District Judge